**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

FILED    ENTERED
LODGED    RECEIVED

JUN 3 0 2021

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

| | |
|---|---|
| JERRY ANTONIO WILLIAMS, | ) |
| | ) |
| Movant, | ) |
| | ) |
| v. | )   Crim No. 1:97-cr-00355-ELH-2 |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Respondent. | ) |

## MOTION FOR COMPASSIONATE RELEASE/REDUCTION IN SENTENCE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A) AND THE FIRST STEP ACT OF 2018

COMES Movant, JERRY ANTONIO WILLIAMS ("Williams"), appearing *pro se,* and respectfully moves the Court under 18 U.S.C. § 3582(c)(1)(A)(i) to modify his sentence and immediately release him to home confinement and a period of supervised release. The unprecedented threat of COVID-19 poses extraordinary risks to Williams' health. The virus thrives in densely packed populations, and the USP is ill-equipped to contain the pandemic and prevent COVID-19 from becoming a de facto death sentence for Williams. Williams' diagnosed medical conditions make him especially vulnerable to the deadly risks of COVID-19. Allowing Williams to finish out his sentence at home is the only prudent response to the extraordinary and compelling circumstances created by the novel coronavirus.

### I. JURISDICTION

The district court's jurisdiction to correct or modify a defendant's sentence is limited to those specific circumstances enumerated by Congress in 18 U.S.C. § 3582. The scope of a proceeding under 18 U.S.C. § 3582(c)(2) in cases like this one is extremely limited. *Dillon v. United States,* 130

1

S.Ct. 2683, 2687(2010). It is black-letter law that a federal court generally "may not modify a term of imprisonment once it has been imposed." *Id.* However, Congress has allowed an exception to that rule "in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission." 18 U.S.C. § 3582(c)(2); see also, *Freeman v. United States*, 131 S.Ct. 2685 (2011) (reciting standard for sentence modifications). Such defendants are entitled to move for retroactive modification of their sentences. *Dillon*, 130 S.Ct. at 2690–91.

## II. **STATEMENT OF THE CASE**

On December 23, 1997, following a jury trial, Williams was found guilty of Count 1, 5, and 6 of the redacted Fourth Superseding Indictment charging Conspiracy to Murder and Kidnap in Aid of Racketeering, in violation of 18 U.S.C. § 1959(a)(5); Conspiracy to Retaliate Against a Witness, in violation of 18 U.S.C. § 371 [18 U.S.C. §§ 1513(a)(1)(A) and (a)(1)(B)]; and Conspiracy to Distribute Heroin and Cocaine, in violation of 21 U.S.C. § 846.

Williams was indicted with numerous others in criminal action number 96-0458 ("the previous indictment") in the United States District Court for the District of Maryland on charges of conspiracy to kidnap and murder Elway Williams in aid of racketeering, see 18 U.S.C. § 1959(a)(5) (West Supp.1998); conspiracy to retaliate against witnesses, see 18 U.S.C. § 371 [18 U.S.C. §§ 1513(a)(1)(A) and (a)(1)(B)] (West 1966 & Supp.1998); and conspiracy to distribute heroin and cocaine, see 21 U.S.C. § 846 (West Supp.1998). These charges stemmed from Williams' involvement in the "Jones organization," a narcotics distribution ring in the Baltimore, Maryland area. One of the overt acts of the alleged conspiracy to retaliate against witnesses was the murder of John Jones. Williams was convicted of all charges and sentenced to life imprisonment.

Approximately one week before trial commenced on the previous indictment, the Government obtained an indictment in criminal action number 97-0355 ("the current indictment") charging Williams with conspiracy to commit murder in aid of racketeering, see 18 U.S.C. § 1959(a)(5); and with murder in aid of racketeering, see 18 U.S.C. § 1959(a)(1) (West Supp.1998). Both counts related to the murder of John Jones. Following his conviction on the charges in the previous indictment, Williams moved to dismiss the current indictment on double jeopardy grounds, maintaining that he had already been prosecuted for his participation in the Jones organization generally and for the murder of John Jones in particular. After the Government dismissed the conspiracy count of the current indictment, the district court denied the motion to dismiss. Williams appealed order of the district court denying his motion to dismiss the indictment against him on double jeopardy grounds. Finding no error, the Fourth Circuit Court of Appeals affirmed Williams' sentence and conviction.

## III. DISCUSSION

As a preliminary matter, Williams respectfully requests that this Court be mindful that *pro se* complaints are to be held "to less stringent standards than formal pleadings drafted by lawyers," and should therefore be liberally construed. See *Clark v. Cartledge,* 829 F.3d 303 (4th Cir. 2016); *Estelle v. Gamble*, 429 U.S. 97 (1976) (same); and *Haines v. Kerner*, 404 U.S. 519 (1972) (same).

### Williams' Current Conditions of Confinement and Health Conditions.

1.   Defendant, Jerry Antonio Williams, was sentenced in 1998 for Conspiracy to Murder and Kidnap in Aid of Racketeering (Count 1); Conspiracy to Retaliate Against a Witness (Count 5); and Conspiracy to Distribute Heroin and Cocaine (Count 6). This gave Williams a total term of Life imprisonment.

2.   Williams, age 45, currently housed at the United States Penitentiary, in Coleman, Florida ("USP Coleman I").

3

3.   Williams' projected release date is set to Life. However, he suffers from incurable, progressive disease, from which Williams will never recover, to wit: Hypertension. Williams also suffers from prediabetes and he recently contracted coronavirus (COVID-19), among other health issues he has/had. See Exhibit 1.

4.   Under the Centers for Disease Control and Prevention ("CDC") standard, Williams' underlying health issues put him at great risk to be "severely" ill or possibly die. Yet the BOP Medical Department are not seeing Williams for follow-ups, which is a demonstration of "deliberate indifference," disregarding a substantial risk of harm to Williams. See Exhibit 2. The BOP is not doing what it should to treat Williams for prediabetes and his worsening case of hypertension.

**Facts:**

*Hypertension*. Hypertension is another name for high blood pressure. It can lead to severe health complications and increase the risk of heart disease, stroke, and sometimes death.

Blood pressure is the force that a person's blood exerts against the walls of their blood vessels. This pressure depends on the resistance of the blood vessels and how hard the heart has to work.

Hypertension is a primary risk factor for cardiovascular disease, including stroke, heart attack, heart failure, and aneurysm. Keeping blood pressure under control is vital for preserving health and reducing the risk of these dangerous conditions.

*Prediabetes*. Prediabetes is a serious health condition where blood sugar levels are higher than normal, but not high enough yet to be diagnosed as diabetes. Prediabetes puts you at increased risk of developing type 2 diabetes, heart disease, and stroke.

*COVID-19*. COVID-19 is the disease caused by the new coronavirus that emerged in China in December 2019. COVID-19 symptoms include cough, fever or chills, shortness of breath or difficulty breathing, muscle or body aches, sore throat, new loss of taste or smell, diarrhea, headache, new fatigue, nausea or vomiting and congestion or runny nose. COVID-19 can be severe, and some cases have caused death.

**i.   UNDER THE FIRST STEP ACT, THIS COURT HAS BROAD AUTHORITY TO DETERMINE WHETHER EXTRAORDINARY AND COMPELLING CIRCUMSTANCES EXIST TO MODIFY WILLIAMS' SENTENCE AND RELEASE HIM TO HOME CONFINEMENT.**

The First Step Act ("FSA") expressly permits Williams to move this Court to reduce his term

of imprisonment and seek compassionate release. See 18 U.S.C. § 3583(c)(1)(A)(i). Under normal

circumstances, a defendant can seek recourse through the courts after either (1) the BOP declines to file such a motion on his behalf; or (2) there has been of lapse of 30 days from the warden's receipt of the defendant's request, whichever is earlier. *Id.* Williams files this motion now in light of the urgent nature of this matter.

**Fact:** Williams filed a Compassionate Release through the BOP system on December 23, 2020 but B.M. Antonelli, Complex Warden denied his request on January 7, 2021.  See Exhibit 3. Subsequently, Williams appealed the denial of his request for reduction in sentence, which was denied on January 26, 2021. *Id.* Because the BOP declined to file such a motion on Williams' behalf, exhaustion of administrative remedies is not an issue in this case. See 18 U.S.C. § 3582(c)(1)(A).

After exhausting the administrative process, "a court may then 'reduce the term of imprisonment' after finding that 'extraordinary and compelling reasons warrant such a reduction' and 'such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Ebbers*, 2020 WL 91399, at \*4, 02-CR-1144 (VEC) (S.D.N.Y. Jan. 8, 2020), ECF No. 384. "In making its decision, a court must also consider "the [sentencing] factors set forth in section 3553(a) to the extent that they are applicable."" *Id.* (quoting 18 U.S.C. § 3582(c)(1)(A)).

While courts have noted that the Sentencing Commission's applicable policy statement on what constitutes "extraordinary and compelling reasons" to warrant a sentence reduction is anachronistic because it has not been updated since passage of the FSA, they still continue to be guided by the Sentencing Commission's descriptions of "extraordinary and compelling reason." See, e.g., *Ebbers*, 2020 WL 91399, at \*4 (S.D.N.Y. Jan. 8, 2020). However, the Sentencing Commission's statements do not constrain the court's independent assessment of whether

5

"extraordinary and compelling" reasons warrant a sentence reduction in light of the First Step Act's amendments. *United States v. Beck*, 2019 WL 2716505, at \*5-6 (M.D.N.C. June 28, 2019); see also *Ebbers*, 2020 WL 91399, at \*4. Indeed, "the district courts themselves have the power to determine what constitute extraordinary and compelling reasons for compassionate release." *United States v. Young*, 2020 WL 1047815, at \*6 (M.D. Tenn. Mar. 4, 2020) (collecting cases).

### *COVID-19 Update*

As of April 9, 2021, we have 134,038,180 cases of COVID-19 and 2,904,554 deaths worldwide. The United States alone has 31,063,105 confirmed cases of COVID-19 and 560,078 deaths.

Recently, COVID-19 vaccine has been approved but supplies are limited. The Associated Press ("AP") reported in November 2020 that documents obtained from BOP revealed that although coronavirus rates were surging in inmate populations, vaccinations would be "reserved for staff" when they are received. When explaining its vaccination process, BOP said earlier on Tuesday it planned to offer vaccines to full-time bureau staff members, saying doing so "protects the staff member, the inmates at the facility, and the community." However, BOP spokesman Justin Long told the AP, "At this time, we can confirm high risk inmates in a few of the BOP facilities in different regions of the country have received the vaccine." The AP noted that BOP has not stated how many inmates have been vaccinated or what the selection process is. It is also unclear at this time how many doses of the vaccine BOP has received. The AP also reported that 3,624 federal inmates and 1,225 BOP staff members have tested positive for COVID-19 so far, with 171 inmate deaths due to the coronavirus.

6

Due to limited supplies, not everyone will be able to get a COVID-19 vaccine right away. Hence, the government and medical experts, advise that to protect yourself and help prevent spreading the virus to others, do the following:

- Wash your hands regularly for 20 seconds, with soap and water or alcohol-based hand rub;
- Cover your nose and mouth with a disposable tissue or flexed elbow when you cough or sneeze;
- Avoid close contact (1 meter or 3 feet) with people who are unwell; and
- Stay home and self-isolate from others in the household if you feel unwell.

**Note:** There are several different types of vaccines in development. All of them teach our immune systems how to recognize and fight the virus that causes COVID-19. Sometimes this process can cause symptoms, such as fever. These symptoms are normal and are a sign that the body is building protection against the virus that causes COVID-19. It typically takes a few weeks for the body to build immunity (protection against the virus that causes COVID-19) after vaccination. That means it's possible a person could be infected with the virus that causes COVID-19 just before or just after vaccination and still get sick. This is because the vaccine has not had enough time to provide protection. See https://www.cdc.gov/coronavirus/2019-ncov/vaccines/facts.html (last accessed January 13, 2021).

A.   **"Extraordinary and Compelling Reasons" Warrant a Reduction in Williams' Sentence.**

1.   COVID-19 Is a Public Health Disaster That Threatens Vulnerable Incarcerated Persons like Williams.

The COVID-19 pandemic continues to roil the United States. As of April 6, 2021, the BOP has 126,053 federal inmates in BOP-managed institutions and 13,688 in community-based facilities. The BOP staff complement is approximately 36,000. There are 371 federal inmates and 1,250 BOP

7

staff who have confirmed positive test results for COVID-19 nationwide. There have been 230 federal inmate deaths and 4 BOP staff member deaths attributed to COVID-19 disease. See https://www.bop.gov/coronavirus/ (last accessed April 8, 2021). Specifically, at USP Coleman I, there are 1 inmate and 38 staff who have confirmed positive test results for COVID-19; at USP Coleman II, there are 29 staff who have confirmed positive test results for COVID-19 and 1 inmate death attributed to COVID-19 disease; at FCI Coleman Low, there are 1 inmate and 28 staff who have confirmed positive test results for COVID-19, 1 inmate and 1 staff deaths attributed to COVID-19 disease; and at FCI Coleman Medium, there are 47 staff who have confirmed positive test results for COVID-19 and 3 inmate deaths attributed to COVID-19 disease. *Id.* Bottom line, Federal facilities are not immune.

Conditions of confinement create an ideal environment for the transmission of highly contagious diseases like COVID-19. Because inmates live in close quarters, there is an extraordinarily high risk of accelerated transmission of COVID-19 within jails and prisons. Inmates share small cells, eat together and use the same bathrooms and sinks. . . . . They are not given tissues or sufficient hygiene supplies"); Joseph A. Bick (2007). *Infection Control in Jails and Prisons. Clinical Infectious Diseases 45(8):1047-1055,* at https://academic.oup.com/cid/article/45/8/1047/344842 (noting that in jails "[t]he probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise"). BOP employees are complaining that they lack masks and gloves, hand sanitizer, and even soap.

8

"The [BOP] management plan itself acknowledges [that] symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up. . . . We don't know who's infected." *Manrique*, 2020 WL 1307109, at *1.10

Indeed, as the Second Circuit recently observed, present information about the COVID-19 epidemic and the BOPs' prior failings in 2019 to adequately protect detainees and allow them access to counsel and their families following a fire and power outages suggest that the virus' impact will likely be "grave and enduring." *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, No. 19-1778, 2020 WL 1320886, at *12 (2d Cir. Mar. 20, 2020).

> ### 2. Williams' Vulnerability to COVID-19 Due to His High Medical Risk Is an Extraordinary and Compelling Reason That Warrants a Sentence Reduction.

Williams is particularly vulnerable to COVID-19 because of his hypertension and prediabetes. As the COVID-19 pandemic continues, it potentially poses a particular issue for older people and people with pre-existing medical conditions (such as diabetes, heart disease, lung disease, and autoimmune disease) appear to be more vulnerable to becoming severely ill with the COVID-19 virus.

> *Lung Problems, Including Asthma*
> COVID-19 targets the lungs, so you're more likely to develop severe symptoms if you have preexisting lung problems, such as: Moderate to severe asthma, Chronic obstructive pulmonary disease (COPD), Lung cancer, Cystic fibrosis, Pulmonary fibrosis. In addition to being an asthma trigger, smoking or vaping can harm your lungs and inhibit your immune system, which increases the risk of serious complications with COVID-19.
>
> *Heart Disease, Diabetes and Obesity*
> People with diabetes, heart disease, high blood pressure or severe obesity are more likely to experience dangerous symptoms if infected with COVID-19. This may be of particular concern in the United States, which has seen increasing rates of obesity and diabetes over the years.

9

When people with diabetes develop a viral infection, it can be harder to treat due to fluctuations in blood glucose levels and, possibly, the presence of diabetes complications. There appear to be two reasons for this. Firstly, the immune system is compromised, making it harder to fight the virus and likely leading to a longer recovery period. Secondly, the virus may thrive in an environment of elevated blood glucose.

Moreso, obesity and diabetes both reduce the efficiency of a person's immune system. Diabetes increases the risk of infections in general. This risk can be reduced by keeping blood sugar levels controlled and continuing your diabetes medications and insulin. Your risk of serious illness may also be higher if you have heart diseases such as cardiomyopathy, pulmonary hypertension, congenital heart disease, heart failure or coronary artery disease.

### How SARS-COV-2 Causes Disease and Death in COVID-19

"You'd think underlying lung problems or immune system problems will be the greatest risk," says Dr. Levitt. "But it seems the biggest risk factors have been hypertension, diabetes and obesity." That has led many scientists to suspect that the profound inflammation seen in severe cases of COVID-19 may be yet another problem linked to SARS-COV-2's fondness for ACE2. People with diabetes, hypertension and heart disease have more ACE2 on their cells as a response to the higher levels of inflammation that come with their condition; ACE2 has an anti-inflammatory effect. When SARS-COV-2 sticks to ACE2 and reduces its ability to do its job, the underlying inflammation gets worse.

When inflammation gets completely out of control the body enters what is called a cytokine storm. Such storms drive the most severe outcomes for COVID-19, including multi-organ failure. There is thus an obvious role for anti-inflammatory drugs. But knowing when to administer them is hard. Go too late, and the storm will be unstoppable; go too early, and you may dampen down an immune response that is turning the tide. A recent article in the Lancet suggests that it would help if COVID-19 patients were routinely screened for hyper-inflammation to help identify those who might benefit from anti-inflammatory drugs. But not everyone is convinced today's drugs have much to offer. "We tried [a range of anti-inflammatory treatment] and it actually didn't work," says Rajnish Jaiswal, who has been working on the front line of COVID-19 treatment at New York's Metropolitan Hospital.

https://www.economist.com/briefing/2020/06/06/how-sars-cov-2-causes-disease-and-death-in-covid-19.

Hence, it is appropriate for Williams to be released into an environment where he and his

loved ones can control and direct his medical care. It is important for all of us to remember that

convicted criminals are sent to prison as punishment—not for punishment. People who are severely

debilitated or are in the midst of dying are usually no longer a threat to society, and there is not a

compelling social advantage to keeping them in prison.

**Note:** According to the Centers for Disease Control and Prevention ("CDC"), COVID-19 is a new
disease and there is limited information regarding risk factors for severe disease. Based on
currently available information and clinical expertise, older adults and people of any age who
have serious underlying medical conditions might be at higher risk for severe illness from
COVID-19.

    a.    Based on what we know now, those at high-risk for severe illness from COVID-19
are:
- People 60 years and older
- People who live in a nursing home or long-term care facility

    b.    People of all ages with underlying medical conditions, particularly if not well
controlled, including:

- People with chronic lung disease or moderate to severe asthma
- People who have serious heart conditions
- People who are immunocompromised
- Many conditions can cause a person to be immunocompromised, including
cancer treatment, smoking, bone marrow or organ transplantation, immune
deficiencies, poorly controlled HIV or AIDS, and prolonged use of
corticosteroids and other immune weakening medications
- People with severe obesity (body mass index [BMI] of 40 or higher)
- People with diabetes
- People with chronic kidney disease undergoing dialysis
- People with liver disease

are the hallmark of those who are most endangered by the instant pandemic. These are "extraordinary

and compelling reasons" for his release. See Note 1(A), § 1B1.13 (expressly recognizing that "other

reasons" may exist for granting compassionate release), see Note 1(D), § 1B1.13 Note 1(D)

(recognizing that extraordinary and compelling reasons exists "other than, or in combination with,

the reasons described in subdivisions (A) through (C)."). Here, Williams' high susceptibility to

COVID-19 falls within the purview of this catchall. Moreover, courts have noted that while § 1B1.13

provides "helpful guidance" for determining what constitutes an extraordinary and compelling reason to warrant a sentence reduction, the inquiry does not end there. Rather, district courts have the freedom to shape the contours of what constitutes an extraordinary and compelling reason to warrant compassionate release. Given the highly infectious nature of COVID-19, the inability in a facility like CI to practice any of the hygienic and social distancing techniques that the Center for Disease Control has put in place to prevent rapid transmission, and the fact that Williams suffers from ailments that have already been identified as "high risk," this Court should find that Williams' legitimate medical risk is a sufficiently extraordinary and compelling basis for granting compassionate release.

A recent letter by fourteen U.S. senators of both parties underscores this position. Writing to U.S. Attorney General William Barr and BOP Director Michael Carvajal, they stated: "[We] urge you to take necessary steps to protect [inmates in Federal custody] particularly by using existing authorities under the First Step Act (FSA). . . . We have reviewed the Federal Bureau of Prisons (BOP) COVID-19 Action Plan, which . . . notably does not include any measures to protect the most vulnerable staff and inmates. . . . [I]t is important . . . that the most vulnerable inmates are released or transferred to home confinement, if possible." And as the Second Circuit noted about COVID-19 in a unanimous recent opinion, "The impact of this recent emergency on jail and prison inmates, their counsel . . . , the United States Attorneys, and the BOP, including the individual Wardens and the personnel of each facility, is just beginning to be felt. Its likely course we cannot foresee. Present information strongly suggests, however, that it may be grave and enduring." *Fed. Defs. of New York, Inc.*, 2020 WL 1320886, at *12.

12

Finally, in the last few months, other jails and prisons have already started to proactively release elderly and sick inmates who are at high risk of infection, as well as releasing as many nonviolent offenders as possible in an effort to reduce the incarcerated population and thus reduce the risk of spread. For example, on March 25, 2020, New York City announced that it would release 300 inmates from Rikers Island. Approximately 1,700 inmates have been released from Los Angeles County Jails, and 1,000 inmates are to be released from New Jersey jails. Therefore, while COVID-19 remains an unprecedented emergency, many states (and politicians) have recognized that they have a duty to flatten the curve inside incarcerated spaces. So, too, should this Court.

> 3.    Courts Have Granted Compassionate Release in Light of the Instant Pandemic.

Courts in the Southern and Eastern Districts of New York have granted compassionate release based on COVID-19. See *United States v. Wilson Perez*, No. 17 Cr. 513 (AT) (S.D.N.Y. Apr. 1, 2020), ECF No. 98, (granting release based on health issues and finding court could waive exhaustion requirement; government did not object based on defendant's medical conditions); *United States v. Mark Resnick*, No. 12 Cr. 152 (CM) (S.D.N.Y. April 2, 2020), ECF No. 461 (granting compassionate release because of defendant's age and medical conditions in light of COVID-19); *United States v. Eli Dana*, No. 14 Cr. 405 (JMF) (S.D.N.Y. Mar. 31, 2020), ECF No. 108 (granting compassionate release motion, where government consented, because of defendant's age and medical conditions and the risk posed by COVID-19); *United States v. Damian Campagna*, No. 16 Cr. 78 (LGS), 2020 WL 1489829, at *1 (S.D.N.Y. Mar. 27, 2020) (granting compassionate release sentencing reduction to defendant convicted of firearms offenses based on defendant's health and threat he faced from COVID-19; government consented to reduction and agreed health issues and COVID-19 were basis for relief); *United States v. Daniel Hernandez*, No. 18 Cr. 834 (PAE)

13

(S.D.N.Y. Apr. 1, 2020), ECF No. 446 (granting compassionate release after BOP denied the request and converting remaining sentence to home confinement); *United States v. Jose Maria Marin*, No. 15 Cr. 252 (PKC) (E.D.N.Y. Mar. 30, 2020), ECF No. 1325-1326 (waiving exhaustion requirement and granting compassionate release to defendant based on special risks he faced from COVID-19).

So, too, have courts across the country. See *United States v. Andre Williams*, No. 04 Cr. 95 (MCR) (N.D. Fla. Apr. 1, 2020) (granting release based on defendant's health and COVID-19); *United States v. Teresa Ann Gonzalez*, No. 18 Cr. 232 (TOR) (E.D. Wa. Mar. 25, 2020), ECF No. 834 (waiving any further exhaustion attempts as futile and granting compassionate release based on defendant's health issues and COVID-19 pandemic); *United States v. Jeremy Rodriguez*, No. 03 Cr. 271 (AB) (E.D. Pa. Apr. 1, 2020), ECF No. 135 (finding court has independent authority to determine "extraordinary and compelling" reasons and granting compassionate release based in part on defendant's health and COVID-19; no exhaustion issue because 30 days had passed); *United States v. Pedro Muniz*, No. 09 Cr. 199 (S.D. Tex. Mar. 30, 2020), ECF No. 578 (granting compassionate release based on health conditions that made inmate susceptible to COVID-19); *United States v. Samuel H. Powell*, No. 94 Cr. 316 (ESH) (D.D.C. Mar. 27, 2020), ECF No. 97 (granting compassionate release for 55-year old defendant with respiratory problems in light of outbreak, without waiting for 30 days or other exhaustion of administrative remedies through the BOP); *United States v. Agustin Francisco Huneeus*, No. 19 Cr. 10117 (IT) (D. Mass. Mar. 17, 2020), ECF No. 642 (granting defendant's emergency motion based on COVID-19).

See also *United States v. Watkins*, Case No. 15-20333 (E.D. Mich. Jul. 16, 2020), granting compassionate release to prisoner whose only underlying condition was previously-treated latent TB; and *Singh v. Barr*, No. 20-CV-02346-VKD, 2020 WL 1929366, at \*10 (N.D. Cal. Apr. 20, 2020)

14

(granting release from immigration custody for petitioner with latent TB, hypertension, and obesity); and *US v. Powell*, No. 1:94-cr-0316-ESH (D.D.C. Mar. 24, 2020), Recommendation, Dkt. 94 (Court recommendation to BOP to immediately place defendant, who is 55-years old and suffers from several respiratory problems (including asthma and sleep apnea) into home confinement to serve the remainder of his prison term); and in *United States v. Gerard Scparta*, No. 18 Cr. 578 (AJN), ECF Dkt. 69 (S.D.N.Y. Apr. 19, 2020), Judge Nathan granted a compassionate release motion of a 55-year old defendant who suffers from high blood pressure, high cholesterol, sleep apnea, and hypertension. The court found that it could waive § 3582(c)(1)(A)'s 30-day waiting period and hear the motion, and describes FCI Butner's "Kafkaesque" "14-day quarantine" process—which is neither a true "quarantine" nor actually limited to 14 days—before releasing inmates to home confinement.

## B.     The 18 U.S.C. § 3553 Factors Are Met in This Case

Regarding the 18 U.S.C. § 3553(a) factors, under the circumstances presented by Williams' serious medical conditions and the risks posed by COVID-19 in a correctional facility, the sentence that Williams has served is sufficient, but not greater than necessary, to comply with the purposes of sentencing. Therefore, because Williams satisfies the criteria of extraordinary and compelling reasons and because Williams does not pose a danger to the safety of any other person or to the community, compassionate release is appropriate.

### A.     Covered Offense: Conspiracy to Commit Murder or Kidnapping in Aid of Racketeering

Section 404(a) of the First Step Act defines a "covered offense" as "a violation of a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010 (Public Law 111-220; 124 Stat. 2372), that was committed before August 3, 2010." First Step Act § 404(a).

This language does not, on its face, restrict eligibility to defendants who were only convicted of a singular violation of a federal criminal statute whose penalties were modified by section 2 or section 3 of the Fair Sentencing Act. So long as a defendant was convicted of "a violation"—i.e., at least one violation—for which the penalties were modified by section 2 or 3 of the Fair Sentencing Act, he or she is eligible for relief under the First Step Act.

In *United States v. Powell*, 2019 WL 4889112 (D. Conn. 2019), the defendant had been convicted of racketeering and crack cocaine conspiracy offenses. When the defendant sought to reduce his sentence under the First Step Act, the Government argued that the court could not reduce the defendant's sentence on his RICO convictions because they were not covered offenses. The court disagreed, concluding that the language of Section 404(a) does not, on its face, restrict eligibility to defendants who were only convicted of a singular violation of a federal criminal statute whose penalties were modified by section 2 or section 3 of the Fair Sentencing Act. So long as a defendant was convicted of "a violation"—i.e., at least one violation—for which the penalties were modified by section 2 or 3 of the Fair Sentencing Act, he or she is eligible for relief under the First Step Act. *Id.* at *3. The *Powell* court believed that this expansive view of a defendants' eligibility under the First Step Act was also appropriate because "various courts agree that the First Step Act should be construed broadly." *Id.* at *3 (citations omitted). Because the defendant had been convicted of a covered offense (conspiracy to possess with intent to distribute 50 grams or more of cocaine base, in violation of § 21 U.S.C. §841 (a)(1), (b)(1)(A), and § 846), the *Powell* court determined that it could reduce the defendant's sentence on his racketeering charges. *Id.* at *4.

Williams argues that his offense of conspiring to commit murder or kidnap in aid of racketeering is a covered offenses. Probation asserted that a conviction of violent crimes in aid of

16

racketeering activity (conspiracy to attempt commit murder of kidnap) carried a maximum sentence of 10 years. However, since the offense resulted in the death of John Jones, his offense was cross-referenced to the Homicide Guidelines under § 2A1.1– First Degree Murder (if the death was caused intentionally or knowingly), which carried a maximum sentence of life imprisonment. It is essential to note that Williams' racketeering offense should have been cross-referenced to the Homicide Guidelines under § 2A1.2– Second Degree Murder(in any other case). 18 U.S.C. § 1959 - Violent Crimes in Aid of Racketeering Activity, which reads:

(a)     Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished—

(1)     for murder, by death or life imprisonment, or a fine under this title, or both; and for kidnapping, by imprisonment for any term of years or for life, or a fine under this title, or both;

(2)     for maiming, by imprisonment for not more than thirty years or a fine under this title, or both;

(3)     for assault with a dangerous weapon or assault resulting in serious bodily injury, by imprisonment for not more than twenty years or a fine under this title, or both;

(4)     for threatening to commit a crime of violence, by imprisonment for not more than five years or a fine under this title, or both;

(5)     for attempting or conspiring to commit murder or kidnapping, by imprisonment for not more than ten years or a fine under this title, or both; and

(6)     for attempting or conspiring to commit a crime involving maiming, assault with a dangerous weapon, or assault resulting in serious bodily injury, by imprisonment for not more than three years or a fine of [1] under this title, or both.

17

18 U.S.C. §§ 1959(a)(1)-(5). Therefore, attempting or conspiring to commit murder or kidnapping felony carries a maximum of ten years, not life. 18 U.S.C. § 1959(a)(5). Thus, conspiring to commit murder or kidnapping does not expose Powell to a statutory maximum of life, but instead Williams shall be imprisoned for any term of years or for life.

Accordingly, having been convicted of a "covered offense," Williams is eligible for relief under the First Step Act.

### B.    Scope of Relief

Williams argues that his sentence should be reduced, as he has served almost twenty-four (24) years in prison to date, and since his incarceration began, he has taken numerous steps to attempt to improve himself in "post-conviction rehabilitation." In addition, Williams' 1997 Sentencing Guidelines calculations erroneously classified him as if he had been convicted of committing a first-degree murder, when the jury actually convicted him of conspiracy to commit murder or kidnapping with a statutory maximum sentence of ten years imprisonment. *Id.*

As the court in *Boulding* and many others have held, the First Step Act calls for a level of discretion that is previously unseen in sentencing statutes. See 379 F. Supp. 3d at 653 ("The First Step Act is different. The Sentencing Commission has nothing to do with it. Rather, Congress has directly authorized the possible reduction under 18 U.S.C. § 3582(c)(1)(B)."). The First Step Act does not "impose any extrinsic limits on a sentencing court." *Mack*, 2019 WL 3297495, at *12.

The Sentencing Guidelines calculations then were applied to Williams' offense of conviction, resulting in a life sentence. At sentencing, Judge William M. Nickerson imposed the statutory term of life imprisonment for Williams' racketeering conspiracy offense. It is important for the Court to address Williams' entitlement to have his erroneous statutory life sentence reduced to an

18

imprisonment range of 324 to 405 months (based on a Total Offense Level of 38 and a Criminal History Category of IV).

After the Fair Sentencing Act, the conviction under conspiracy to commit murder or kidnapping now mandate a statutory maximum of ten years. See 18 U.S.C. § 1959(a)(5). In other words, if Williams' had been sentenced today for his conspiracy conviction, he could not have received a life sentence.

In the exercise of its discretion under Section 404(b) of the First Step Act, the Court must consider all of the factors under 18 U.S.C. § 3553(a) to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in (paragraph 2) of this subsection." See *Rose*, 379 F. Supp. 2d at 234 ("[E]ven if consideration of § 3553(a) factors is not expressly required by the First Step Act, the Court concludes that it is appropriate to use that familiar framework to guide the exercise of discretion conferred by the First Step Act."); see also *United States v. Romano*, 794 F.3d 317, 339 (2d Cir. 2015) (recognizing the relevance of the § 3553(a) factors in considering the length of a sentence). Under paragraph (2) of this subsection, the sentence must "reflect the seriousness of the offense, [] promote respect for the law, and [] provide just punishment for the offense," as well as "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

In addition, the statute requires consideration of "the nature and circumstances of the offense and the history and characteristics of the defendant," "the kinds of sentences available," the relevant "sentencing range established" for the offense, and the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. §§ 3553(a)(1), (3),(4), and (6).

19

C.    The Sentencing Framework

In accordance with the Supreme Court's decision in *United States v. Booker*, 125 S. Ct. 738

(2005) and the Second Circuit's decision in *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005),

the sentence to be imposed was reached through consideration of all of the factors identified in 18

U.S.C. § 3553(a), including the advisory Sentencing Guidelines (the "Guidelines") established by

the United States Sentencing Commission. Thus, the sentence to be imposed here is the result of a

consideration of:

> (1)    the nature and circumstances of the offense and the history and characteristics
>        of the defendant;
> (2)    the need for the sentence imposed —
>        (A)    to reflect the seriousness of the offense, to promote respect for the
>               law, and to provide just punishment for the offense;
>        (B)    to afford adequate deterrence to criminal conduct;
>        (C)    to protect the public from further crimes of the defendant; and
>        (D)    to provide the defendant with needed educational or vocational
>               training, medical care, or other correctional treatment in the most
>               effective manner;
> (3)    the kinds of sentences available;
> (4)    the kinds of sentence and the sentencing range established for —
>        (A)    the applicable category of offense committed by the applicable
>               category of defendant as set forth in the guidelines . . .;
> (5)    any pertinent policy statement . . . [issued by the Sentencing Commission];
> (6)    the need to avoid unwarranted sentence disparities among defendants with
>        similar records who have been found guilty of similar conduct; and
> (7)    the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). A sentencing judge is permitted to find all the facts appropriate for determining

a sentence, whether that sentence is a so-called Guidelines sentence or not. See *Crosby*, 397 F.3d at

111.

*The Offense Conduct*

Beginning in the late 1980s, Anthony Jones operated an increasingly large and violent drug

distribution ring ("the Jones organization") in east Baltimore, Maryland. As a means of protecting

20

the organization and fostering a reputation as one to be feared and respected, Jones engaged in or ordered numerous acts of violence and intimidation against others. Williams, as one of Jones' chief lieutenants, was directly or indirectly involved in many of these acts.

The trial in this case primarily concerned the murder of John Jones ("John"), Jones' adopted brother. In February 1997, Jones learned that John was cooperating with a federal investigation of the Jones organization. Jones, who at that time was incarcerated in a federal penitentiary in Pennsylvania, instructed Williams to arrange for John's murder. The Government presented evidence that the murder was ultimately carried out by Thomas and Simms. Based upon the evidence presented at trial, Williams and Thomas were convicted of murder in aid of racketeering, see 18 U.S.C.A. § 1959(a)(1) (West 2000); Thomas and Simms were convicted of conspiracy to distribute heroin and cocaine, see 21 U.S.C.A. § 846 (West 1999); and Thomas was convicted of conspiracy to murder in aid of racketeering, see 18 U.S.C.A. § 1959(a)(5) (West 2000), and conspiracy to retaliate against witnesses, see 18 U.S.C.A. § 1513(a)(1) (West 2000).

### The Relevant Statutory Provisions

In this case, the maximum term of imprisonment is ten years, pursuant to 18 U.S.C. §§ 1959(a)(5) and 2E1.3. In addition, a term of no more than three years of supervised release may be imposed if a sentence of imprisonment is imposed, pursuant to 18 U.S.C. § 3583(b)(2). Williams is not eligible for probation since he has been convicted of an offense for which probation has been expressly precluded. 18 U.S.C. § 3561(c)(a). The maximum fine is $250,000, pursuant to 18 U.S.C. § 3571. A special assessment in the amount of $100 is mandatory, pursuant to 18 U.S.C. § 3013.

### The Sentence

Williams received a life without parole sentence on his conspiracy to commit murder or kidnap cross-referenced to first-degree murder. At the time of his sentencing, there was no

21

opportunity to persuade the sentencing judge to impose any lesser sentence. This sentencing procedure was permitted under governing law at the time of sentencing.

**Note:** As for the conspiracy to commit murder or kidnap in aid of racketeering conviction, a conspiracy to commit murder conviction "carries a maximum penalty of 10 years incarceration. As a result, the murder predicate act does not drive the Murder in Aid or Racketeering statutory maximum penalty. Put another way, the conspiracy to commit murder charge provides no basis for a sentence longer than ten years. Because none of Williams convictions now provide for a life sentence, his sentence of life imprisonment must be reduced to no more than the highest sentence now possible: ten years.

On February 25, 2013, Williams filed a Motion for Reduction of Sentence Pursuant to 18 U.S.C. § 3582(c)(2)," in which the Supreme Court of the United States "give retroactive effect to Amendment *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L. Ed. 2d 621 under U.S.S.G. § 1B1.10 and reduce his sentence from Life to 240-420 months. See Doc. 61.[1] Williams suggests that the Senetncing Commission has "expressly designated Booker as one that may be applied retroactively," citing U.S.S.G. § 1B1.10(c). *Id.* However, on May 7, 2014, the District Court denied Williams' motion for reduction of sentence stating that, "*Booker* does not provide and opportunity for you to be resentenced. *Booker* applied retroactively only to cases that were pending on direct review when it was decided. *United States v. Nguyen*, 2011 F. App'x 191, 193 (4th Cir. 2006). You were convicted of murder in aid of racketeering and sentenced by this Court in 1998, and that sentence was affirmed by the Fourth Circuit in 2001, long before Booker was decided in 2008." See Doc. 397.

[1]

"Doc." refers to the United States District Court for the District of Maryland, Baltimore Division in Criminal No. 1:97-cr-00355-ELH-2, which is immediately followed by the Docket Entry Number.

22

Section 404 of the First Step Act applies to *Booker*, *Apprendi*, and *Alleyne*. Section 404– Is it a "plenary" resentencing? Section 404 is a "resentencing," not a narrow adjustment as under 3582(c)(2). Courts apply *Booker*, *Apprendi*, *Alleyne*, and the 3553(a) factors regardless of whether it is called a "plenary" resentencing.

A "plenary" resentencing might be defined to require application of non retroactive changes in the guidelines, circuit law, or statutory law. E.g., Rose, 379 F.Supp.3d at 232. Courts often find it unnecessary to decide whether it is a "plenary" resentencing. Courts routinely impose reduced sentences below the GLR based on what the sentence would be today – e.g., under the current career offender guideline, changes in circuit law regarding what counts as a crime of violence, or changes in statutory law such as Section 401 to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 3553(a)(6). A court within the Second Circuit recently held that a Section 404 proceeding is a plenary resentencing. See Ruling at 9 12, *United States v. Medina*, No. 3:05 cr 00058 (D. Conn. July 17, 2019), ECF No. 1466.

### *Unwarranted Sentence Disparities Among Defendants With Similar Records Who Have Been Found Guilty of Similar Conduct*

With respect to the need to avoid unwarranted sentencing disparities, Williams' sentence is grossly disparate relative to his co-defendant Thomas (the person who actually committed the murder, as opposed to Williams' role as an aider or abetter), and what a defendant today would receive for comparable conduct, received pursuant to the First Step Act by an increasing number of defendants who were sentenced before the passage of the First Step Act.

Here, as discussed above, this case primarily concerned the murder of John. The government presented evidence that the murder was ultimately carried out by Hilton Thomas ("Thomas") and Simms.

23

**Fact:** On June 2, 2016, in the United States District Court for the District of Maryland, the Honorable William M. Nickerson, resentenced Thomas to a term of 480 months on Count 2 (Murder in Aid or Racketeering) as opposed to the life imprisonment previously imposed. See Exhibit 4.

See also Bobby James Brown's Amended Judgment in Criminal Case Number ELH-1-00-CR-00100-001 [Exhibit 5] and Thomas Edward Carter's Amended Judgment in Criminal Case Number ELH-1-00-CR-00100-003 [Exhibit 6]. Both Brown and Carter received a life sentence on Count 1: conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin, five kilograms or more of cocaine, and 50 grams or more of cocaine base, in violation of 21 U.S.C. § 846 and § 841(b)(1)(A), as the PSR applied the murder cross-reference provision, based on the first-degree murder of Douglas Pennix in 1999. The Honorable Ellen L. Hollander, U.S. District Judge, in the District Court of Maryland, reduced Brown's sentence on Count 1 to 10 years; and reduced Carter's sentence on Count 1 to 5 years, pursuant to the First Step Act of 2018.

Williams essentially argues that the unwarranted sentencing disparity factor must be determined only with reference to those comparably situated defendants who were sentenced at the time of Williams' sentencing and those being sentenced today under a different sentencing structure. Williams' sentence in 1998 is now disparate relative to his co-defendant Thomas.

Williams' is now, in effect, to be re-sentenced today, after the passage of the First Step Act; and the need to avoid unwarranted sentencing disparities is to be assessed at the time of his sentencing today relative to those comparable offenders who have been sentenced following the passage of the First Step Act. Nor does the First Step Act's lack of retroactivity justify withholding sentencing relief given the overall purpose of the First Step Act amendments, which expressly allowed for the possibility for a sentence reduction based on an individualized assessment of the § 3553(a) factors and other criteria.

24

Next, Williams argues that a reduction of sentence is warranted to avoid unwanted sentencing disparities, taking into consideration case-specific circumstances related to Williams' character, and in light of his post-sentencing rehabilitation. See Doc. 361-1. Williams contends that leaving his current sentence in place would create at least two kinds of disparity: (1) a disparity between Williams and his co-defendant Thomas who was originally sentenced based on murder cross-reference; and (2) a disparity between Williams and other drug offenders whose offense level were cross-referenced with murder but who have received reductions under the First Step Act (e.g. Brown and Carter). In addition to the need to avoid unwarranted sentence disparities, Williams argues that the unique circumstances of his case warrant a variance.

See e.g., *United States v. Vazquez-Rivera*, 470 F.3d 443, 449 (1st Cir. 2006) (recognizing that "a district court may consider disparities among co-defendants in determining a sentence"); *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006) ("Although § 3553(a) does not require district courts to consider sentencing disparity among co-defendants, it also does not prohibit them from doing so."); *United States v. Gomez*, 215 F. App'x 200, 202 (4th Cir. 2007) (implying that consideration of co-defendant disparities is allowed, but concluding that Gomez was not similarly situated to the co-defendant); *United States v. Bennett*, 664 F.3d 997, 1015 (5th Cir. 2011) ("[A]voiding unwarranted sentencing disparities among co-defendants is a valid sentencing consideration."), cert. denied, 11-9109, 2012 WL 733887 (Apr. 2, 2012); *United States v. Simmons*, 501 F.3d 620, 624 (6th Cir. 2007) ("A district judge, however, may exercise his or her discretion and determine a defendant's sentence in light of a co-defendant's sentence."); *United States v. Pulley*, 601 F.3d 660, 668 (7th Cir. 2010) ("Pulley properly contends that § 3553(a)(6) does not allow unwarranted sentencing disparities between co-defendants." (citing *Statham*, 581 F.3d at 556;

*Bartlett*, 567 F.3d at 908–09)); *United States v. Lazenby*, 439 F.3d 928, 933 (8th Cir. 2006) (invalidating a sentence that resulted in unwarranted disparities between the sentences of the defendant and less culpable members of related conspiracies); *United States v. Saeteurn*, 504 F.3d 1175, 1181–83 (9th Cir. 2007) (upholding as a legitimate generalized § 3553(a) consideration the district court's decision to compare defendant with his co-defendants and sentence him in accordance with his role); *United States v. Smart*, 518 F.3d 800, 804 (10th Cir. 2008) ("[A] district court may also properly account for unwarranted disparities between codefendants who are similarly situated, and...the district court may compare defendants when deciding a sentence."); *United States v. Zavala*, 300 F. App'x 792, 795 (11th Cir. 2008) ("It is not erroneous for the district court to have considered the 'unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct' when the statute specifically mandates such consideration."); *United States v. Mejia*, 597 F.3d 1329, 1344 (D.C. Cir. 2010) (considering and rejecting an argument that a disparity between co-defendants' sentences was unwarranted), cert. denied, 131 S. Ct. 586 (2010).

### *Recidivism Risk Level*

Williams was convicted of serious offenses in the underlying federal case and had some significant criminal history. It is notable, however, that Williams' four most serious prior convictions all occurred when he was at a very young age (until he was 21). Williams was sentenced to life to reflect the seriousness of his offenses. In his twenty-four years of imprisonment, he has matured from a rash young man pursuing a lawless, violent lifestyle, to a reflective, empathetic middle-aged adult. According to the Overview of Federal Criminal Cases published by the United States Sentencing Commission for the fiscal year of 2019, the average sentence imposed for murder is 255 months, about three years more than Williams has already served. U.S. SENTENCING COMM'N,

OVERVIEW OF FEDERAL CRIMINAL CASES, FISCAL YEAR 2019, at 9 (2020). However, Williams was not sentenced for murder alone, but rather for conspiracy to commit murder or kidnapping in aid of racketeering. He has spent over half his life so far behind bars. This is significant punishment for his violent crime, depriving him of "the family life" that he "cherish[es] more than anything."

Factoring in Williams' rehabilitation and relatively negligible disciplinary record for twenty-four years, his continued risk to the public if released appears to be markedly reduced as recidivism declines with age, particularly when tempered by significant rehabilitation. Williams is now 45 years old, making him substantially less likely to recidivate than a younger offender. According to a report by the U.S. Sentencing Commission, Williams, at over forty-five years old, has a recidivism rate of 10.1 percent. See U.S. Sent'g Comm'n, The Effects of Aging on Recidivism Among Federal Offenders 3 (Dec. 2017) (reporting that "recidivism measured by rearrest, reconviction, and reincarceration declined as age increased" and that offenders aged 65 or older had a rearrest rate of 13.4 percent, as compared to 67.6 percent for offenders younger than 21). To date, he has served 24 years in BOP custody and has not received any violent disciplinary infraction during that time. While in custody, he has completed all phases of the E-Code program as developed in his individual treatment plan in November 2001, enrolled in countless education classes, and worked hard in his jobs. See Exhibit 7. Williams' E-Code reviewer, M. Patterson, Ph.D., foreman has described him as someone who "demonstrated good communication skills and a willingness to address personal issues. He has a generally cooperative attitude with staff members. When he was really trying, he was able to give insightful answers on his written assignments, including the GED program. He has met the 240-hour minimum and has attempted the GED, passing all but one area."

*Id.* Given the length of his imprisonment, his personal rehabilitation, age, ill health, complete acceptance of responsibility, deeply felt remorse, and proposed release plan, the Court concludes that deterrence and public protection are no longer strong § 3553(a) factors weighing in favor of continued detention.

**Note:** Williams wrote a heartfelt Letter to Judge Ellen L. Hollander, asking that he be granted a second chance. Williams admitted that he was foolish and immature then– that led to the commission of the instant offense. Over the years, Williams has made amends and has expressed remorse for his past wrongdoings, and aim to be a better man moving forward. See Exhibit 8.

Recognizing the severity of his crime, Williams directs the Court to cases where courts have granted compassionate release during the novel coronavirus pandemic to defendants who committed murder. See Dkt. No. 120 at 12-13 (citing *United States v. Rodriguez*, No. 00 Cr. 761-2 (JSR), 2020 WL 5810161, at *5 (S.D.N.Y. Sept. 30, 2020); *United States v. Copeland*, No. 02-cr-01120 (FB), 2020 WL 2537250, at *3 (E.D.N.Y. May 19, 2020); *United States v. Rios*, No. 94cr112 (JBA), 2020 WL 7246440, at *2 (D. Conn. Dec. 8, 2020)).

## C.    **Williams Has a Supportive Family and Transition Plan**

Williams points to a number of letters from his family and friends, attesting to Williams' good character. See Exhibit 9. Specifically, his daughter, Jerae A. Williams, wrote in length how much she loves her father and that he [Williams] is her "rock" and biggest supporter. Jerae also stated that, "When my father was hauled off to prison, I could not even walk yet. My mother was barely 21 years old. My grandmother lost her only son to the system. . . Two life sentences were given to a man who was barely a man." *Id.* Again, Williams was very young when he committed the instant offenses but he is now a changed man– a man remorseful of his prior mistakes, man enough

28

to admit that we was wrong, and a wiser man with every intention to be a father and a productive citizen.

Finally, the combination of factors, age, health conditions, COVID-19 risk, as well as length of time already served, post-sentencing rehabilitation , and the changing sentencing landscape justify granting compassionate release to Williams. Else, it would result in unwarranted sentencing disparities among similarly situated defendants. The Court, exercising its discretion under the First Step Act, will reduce Williams' sentence to 120 months or 10 years as mandated by the statute. If Williams were sentenced today, his guidelines range would be 324 to 405 months. However, his crime in violation of 18 U.S.C. § 1959, calls for a statutory maximum sentence of 10 years. The § 3553(a) factors do not counsel for a sentence outside this range, and the type of variance originally found by the Court may have been appropriate when the original range was so much higher, but not now. This sentence also avoids unwarranted sentencing disparities. More so, his BOP record does not show that he is violent or a threat to public safety.

## IV. CONCLUSION

For the above and foregoing reasons, Williams prays this Court would consider his Motion for Compassionate Release/ Reduction in Sentence Pursuant to 18 U.S.C. § 358c)(1)(A) and the First Step Act of 2018, based upon the fact that he has exhausted available administrative remedy and he has met the "extraordinary and compelling reasons" requirement. Williams' has already served a sentence almost three years longer than what would be imposed today for the same conduct. Remaining in prison would only exacerbate the sentencing disparity created by a sentencing practice which Congress ended with the FSA by clarifying its intent from the beginning. Williams prays that this Court finds that the § 3553(a) factors weigh in favor of reducing his sentence to time served.

Respectfully submitted,

Dated: June 24, 2021.

JERRY ANTONIO WILLIAMS
REG. NO. 00741-748
USP COLEMAN I
U.S. PENITENTIARY
P.O. BOX 1033
COLEMAN, FL 33521
Appearing *Pro Se*

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2021, I mailed a true and correct copy of the above and foregoing Motion for Compassionate Release/ Reduction in Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A) and the First Step Act of 2018 via U.S. Mail, postage prepaid, to Lindsay DeFrancesco, Assistant U. S. Attorney at U.S. Attorney's Office, 36 South Charles Street, Fourth Floor, Baltimore, MD 21201.

JERRY ANTONIO WILLIAMS

30